Thank you Judge Wilkinson and may it please the court, Brandon Boxler on behalf of Mr. Small. There are three grounds for relief in this case. First, there is insufficient evidence that Mr. Small, that the robbers who took the keys from Mr. Rowe had the requisite intent to kill or cause serious bodily harm under the carjacking statute. Second, no exception to the Fourth Amendment's warrant requirement justified the warrantless cell phone searches. And third, the self-report by two jurors who felt uncomfortable or concerned because of the unidentified individual staring at them as they left the courtroom created a presumption of prejudice under Remmer that the government failed to rebut. On the sufficiency issue, Your Honor, although the man who robbed Mr. Rowe had a handgun that night and pointed at Mr. Rowe, there is no evidence that the gun was loaded, that it was operational, that it was used to strike Mr. Rowe, that the man did any other sorts of act of violence towards Mr. Rowe. And that is true even though Mr. Rowe doubly defied the robbers' demands. Whenever the robbers demanded that he hand over everything, Mr. Rowe said, No, you're not getting my house keys. He handed over only his car keys. Then after that act of defiance... Does there have to be evidence that the gun was loaded? No, Your Honor. There doesn't have to be evidence. There could be other things that provide evidence of an intent to kill or cause serious bodily harm. We've got bank robber cases that say if they hand up a notice to the teller and say, I have a gun. Give me the money. And that justifies bank robbery. The teller believing that they mean what they said, that they have a gun and they want the money. Right. I think it's important to look at Section 2119 here where there's not only the element of the actus res that you have in a typical robbery case where there's an act of intimidation, something you're trying to scare the individual to take property. We're not disputing that there was a robbery here in the classic sense. I understand. The statute has the additional mens rea element on top of that. This statute's different, materially different than the bank robbery statute. Correct, Your Honor. That's your proposition. Correct. And that specific mens rea that was added to it is the piece that, under Holloway's statute, you need to do more than just have sort of a threat or intimidation. And here, view the totality of the evidence. No reasonable juror could conclude beyond a reasonable doubt that the men were prepared to kill or harm Mr. Rowe. Why isn't this a jury question? Just up and down. It was submitted to the jury under the proper instructions? I don't think there was any objection to the instruction. That's right, Judge Wilcherson. We do not object to the jury instruction. So the whole question of intent to cause death or inflict serious bodily injury was put before the jury. The evidence was discussed both ways. The jury was the finder of fact, and they made a decision that the elements of the crime were met, and there was plenty of evidence to support that. And, you know, you had Daugherty and Caswell, who were Small's associates, testifying that the gun that Small was carrying was real. It doesn't have to be loaded. If you have a gun, you can knock somebody over the head, bruise them, inflict serious bodily injury, which is the standard. Was there intention that they would do that? You know, this is not your, quote, ordinary vehicle theft. It's well beyond that. You know, you have three masked people. This is taking place in the dead of night. One of the assailants has a gun. He points directly at Mr. Rowe's face, demanded his car keys, and you're saying that that's insufficient in terms of satisfying the elements of a carjacking offense. That's right, Your Honor. And I'm saying I don't understand why the jury isn't a perfectly capable auditor of that when the case is submitted to them under instructions that were not objected to while the district court should be expected to yank them from the court disregarding the conclusion that they came to with a very difficult set of facts for your position. For the same reason that this court reversed in Bailey, even though there was no clean jury instruction in that case, this court— How did the Robinson case take care of that? Oh, in Robinson, Your Honor, the—I believe the guns were loaded, so there was the additional piece— It was a jury question. That's the point I'm getting at on the jury question. Sufficiency is for the jury. I mean, they've got to meet the minimal requirements, but then— Yeah, that's right, Judge King. The jury resolves. We take the view now in the light of which variables of the prosecution. That's right, Judge King. That's right. But that doesn't mean that the jurors don't make mistakes at district court. That's why this court— But Robinson was a carjacking case. Correct. And in Robinson, there was two loaded guns, and the victim in that case complied with the demands. The robbers repeatedly said, do you want to die? Here, we don't have a loaded gun. We don't have the additional verbal threats of violence. Well, in the case example I gave you, you say it doesn't make any difference. The teller doesn't know if he has a gun at all, but the note says so. Right. And we're not arguing that this wasn't— Everybody around is entitled to believe that you're telling the truth, right? Right. And it certainly was scary and terrifying, and we don't dispute that at all. But they're pointing the gun at his head, and if he had resisted, you don't think they would have smacked him with that gun? Or the three of them, I guess, can overpower him, small as a part of a group of three, isn't he? But he was alleged to be the driver who was not present during the actual robbery. Well, but you've got Small and Caswell and Doherty. The gun is pointed at the person's head, and I realize it's not a question of the fear that he might feel. It's a question of whether the specific intent that the perpetrators might have intended. But the question is, could a jury find that if Robinson had resisted, if Rowe had resisted the entreaty to hand over the keys, a jury can conclude that if he resisted, that these people were perfectly willing to inflict the most serious kind of harm upon him. All the circumstances, all the evidence, the mask that comes in at night, ordinary vehicle theft doesn't take place with masked men coming in at night, pointing guns at people's heads and demanding keys. Judge Wilkins, I would say that there was noncompliance in this case, and Mr. Rowe twice refused to comply, and the robbers did not do anything. They wouldn't have gotten their own keys, but they walked away. Well, they had the car keys. Right. They did have the car keys. That's what they really wanted. The house wasn't movable. They could get that car. That's what they wanted. Well, their demand was for everything that he had, and the victim said no. You're not getting my house keys. But they were satisfied. Well, they must have been. They were at least satisfied not to shoot him. Exactly, Judge King. In spite of what they said. In spite of the way they acted. We're assuming that question, Judge King, they had the ability to shoot, that the gun was loaded, that it was operational. Again, there's no gun found. There's no testament to that effect. In the Bailey case that you rely on, I understand they didn't display or possess weapons. Correct. They put a cold, hard object to the back of the victim's head after forcing his way into the car. It wasn't a gun pointed at anyone's face. Correct. But the victim reasonably believed there was a gun at his head, right? And we assume that and said that's not enough. That's right, Judge. That satisfies the threat and intimidation element, but not the specific intent to follow through on the threat. That's exactly right, Judge Harris. And I think that's where I would tie this back up is saying that there is this additional men's right component that you need to do something other than be threatening, be intimidating, be scary. And Holloway reinforces that component. That you need something more than just have a really good bluff. Really be scary. And viewing the totality of the evidence here, the men made certain demands they weren't complied with and they did not react violently. The Caswell and Holloway. Aren't you just giving us a jury argument? No, I don't think so, Your Honor. I think there needs to be substantial evidence of an intent to kill or cause serious bodily harm. And here you have a good bluff. Or inflict serious bodily harm. Right. And there's no even attempt to do that despite defiance. And I think that the Doherty and Caswell robbery that Judge Wilkinson, you've mentioned a couple times now, the robbers did not have any sort of intent to follow through with their threats by brandishing the weapon. In that case, the robbers asked for the victims to empty their pockets and don't make a scene. And the victims refused. They made a scene. They yelled. They screamed. They didn't handle everything. And one of the robbers came around, swiped at his shirt pocket, grabbed the cell phone, and then they ran away. That completely undermines any intent that they were there to sort of impose their will to use the gun as anything other than. Again, you're just asking us to take over the role of jurors and the finders of fact. And to say that there's not even enough evidence here and that we're going to overturn the finder of fact and rule that this is insufficient as a matter of law when people are holding a gun to someone's head and there are three of them in the middle of the night wearing masks and everything, and you say, oh, no reasonable finder of fact could say that they harbored specific intent to inflict serious bodily harm if someone has resisted. People don't like being resisted when they're contempting armed robbery. They get mad. They get angry. And if he had resisted, it raises the ire of those who are on the scene. And jurors understand something like that. They understand when somebody's just there as a joke or the weapon is just being used as some kind of pretext or, you know, a system. They understand the difference between that and when somebody's serious about having somebody comply with their demands. But the point is these are people that arrived at a unanimous verdict after hearing all this evidence and going to all of these circumstances, being given instructions that were not objected to, and that reflected perfectly the elements of the crime. And you're saying that the jurors, that the jurors somehow lacked the sufficient common sense to rule as they did. I don't get it. Two points on that. First, again, I wish you'd get to that search issue. Okay. You're already got it. You have the light on. If you go ahead and do whatever it is you've got to answer the question. I'm happy to move on, Judge King. I was more curious about that, to be honest with you. Well, I think the cell phone search, the abandonment question is actually fairly straightforward because of the government's concession below that there is no evidence one way or the other whether the phone was intentionally abandoned or accidentally dropped. And that means that the government has not established preponderant evidence that it was intentionally abandoned and, therefore, it wasn't abandoned. So I think that the analysis is rather straightforward on the issue of an abandonment. And the record confirms that, that the search that night discovered a phone 50 yards from a vehicle laying alongside a busy footpath where hundreds of people lived. There was no blood on the phone. Hundreds of people lived. It's on the Fort Meade National Security Agency. It's one of the most secure places in the world. That's right. That's right. And he ran through the gate at a high rate of speed in an automobile. Had a wreck, an intruder in Fort Meade and in the National Security Agency. That's right, Judge King. And nothing about the location of that, of the location of the crash, affects the abandonment analysis, that there was no evidence one way or the other whether they found the phone, whether it was abandoned. But where it occurred has to be pertinent to all this. I guess it's relevant atmospherically. It might be more relevant on other issues like exigencies, for example, to the government. I just have a simple sort of geography question. I don't. So it's in the NSA, but there is a dorm and a public sidewalk inside the NSA? That's right, Judge Harris. Okay. I like to think of it as three concentric circles. There's the Fort Meade gates, which is the whole military base, and then inside that there's a separate gate to the NSA. And then inside that, you know, there's inside that NSA boundary there's barracks, there's a restaurant, there's a daycare facility. I got you. Those are people that work there. The actual NSA. Correct. That's right, Judge King. They have top secret clearances. I assume so, Judge King. They're not thieves and carjackers running loose on the place. And that's what this fellow was. So I'd say for the issue of abandonment, there was no evidence that the phone was tied to the carjacker, one way or the other. How could Judge Berdara be wrong when they're in a high-pursuit chase, and along with items of clothing and his cell phone, he ditches them and is under a bridge or somewhere for 11th hour, where 11th hour doesn't seek to recover them. And, you know, the whole touchstone of the Fourth Amendment is expectations of privacy. And if you're throwing your cell phone off to the side of the road in a high-pursuit search, you left behind your expectations of privacy, or at the very least, the officers could reasonably consider the cell phone to have been abandoned. I don't think that, you know, even if you apply Leon to this situation, there is simply, you know, no evidence that the officers acted in bad faith or didn't follow controlling law. If they're in a national—if they are in these circumstances here at night at the National Security Agency and on a high-pursuit search, and they see a cell phone by the side of the road, could these officers reasonably believe that this had been abandoned? And I should think so. I don't think that they would think that there was any expectation of privacy in something that had been ditched and wasn't reclaimed. The only thing I would say on that, Judge Wilkinson, is it assumes that it was— that it was tossed. And here, as the government concedes, there is no evidence one way or the other of that, although it may have been a high-pursuit. No one saw the person clean throw the phone. All these circumstances. That's what they call circumstantial evidence. A lot of people are doing a lot of time on circumstantial evidence, not just a question like this. That's right, Judge King. But I think I'll direct to the government's concession on page 32. Go ahead. I'm sorry. Where they say the analysis in this abandonment inquiry has to look at what was known at the time that the officers performed the search. So some of these additional questions about— I thought they could consider also evidence on these issues, even evidence that came in during the trial. I think we're entitled to look at that, aren't we? Not for the purposes of the reasonableness of the search at the time, whether the officers had reasonably— Anyway, go ahead. I want to say that there are instances where there are real injustices done in the criminal justice system, and I get that. But here, you know, here you have somebody who is at night holding a gun to someone's face to what the jury found was to carjack the car and then go barreling through the gates at Fort Meade and the National Security Agency, driving at high speed, putting in a hot pursuit, a search in an area of the greatest sensitivity to the United States government, and not just its counterterrorism efforts, but many, many other things. And you have somebody violating the security procedures and flying all over the gate. And the officers, obviously, it's good police work to say, look, this is a hypersensitive installation that we are dealing with here. We don't know what's afoot. We don't know whether there's one or whether there are accomplices. You know, they're in the middle of this thing trying to figure out what could happen. And frankly, it's an emergency situation. And, you know, there is no injustice in following Judge Bredar's ruling, careful ruling in the suppression hearing and in crediting the jury's verdict. This is an example of the criminal justice system functioning fairly and police officers, particularly under Leon, not engaging in the kind of violations of law that we need to deter. And this is, you know, the facts of this case is pertaining to every issue are very troubling indeed. Let's end on the national security piece, Judge Wilkinson. One point is that the officers, after they found the phone, they waited 30 minutes before searching it. And if there was this sort of – Before looking at the phone? That's right, Judge King. There's a little something more to that, too. They actually found the phone eight hours after the guy got out of the car that he wrecked. He almost got killed and ran and shed his bloody shirt. He was injured. And the phone was found eight hours after. And they had to put it in the charger. They put it in the charger. And as soon as it charged up enough, it rang or buzzed. It had messages on it. His wife had been trying to call him. And all they did was push the return call button, and she answered. That's how they found out his identification. And until that point, they had somebody running loose in the National Security Agency area that they didn't know the identification of. He was running loose. He was actually hiding in the sewer. And Judge Blake explained that. I think it was Judge Blake. She handled this, and then it was Judge Bredar. That's right, Judge King. Handled the trials that way it was. That's right, Judge King. But she recited her view that it was abandonment, the abandonment theory. The government argued exodus in circumstances and a couple other things, including Leon. And maybe all of them apply. You can pick and choose. But she only used abandonment. And I don't know how you get around abandonment in these circumstances. Just two quick points. You say that circumstances are not enough. But she said they are, and we review that for what? That's a question of fact. I think we have said. The issue of abandonment is a question of fact. No, the ultimate question is a question of law. When the facts, especially here, are not in this area. Well, there are questions of law in there. We can affirm the district judge on alternate grounds. There's abandonment, and there's exodus in circumstances, and there's consent, and then there's Leon. There's a big sign there that says anybody that comes in here is consenting. You come on Fort Bragg, you're consenting to be searched. You come in the national security agency, you consent to be searched. Now, he's going too fast to actually read it, of course, but it's up there for everybody to see in the world. And it should be. Well, on the consent point, of course, that goes to what's the reasonable expectation. She didn't use consent. Right. It seems to me that they can just think almost throw a dart at it. There are plenty of cases where the criminal justice system runs off the rails. And there are other things, other cases, when juries function as juries are supposed to do and where police officers function as police officers are supposed to function. And the question is, which is that? Sometimes the criminal justice system gets things very wrong, but sometimes they get them just right. And what happened here and the disposition that was made of it, I can't find fault. Thank you. Okay. Thank you, Judge Wilkinson. Good morning. May it please the court, my name is Sandra Wilkinson, and together with Assistant U.S. Attorney Paul Riley, we had the pleasure of representing the United States at the trial below. We were there when we questioned Mr. Rowe as the jury listened intently to his testimony about how he had just gotten home and dropped his wife off on a street in Baltimore, a narrow little residential area, parked his car, and then was accosted by three masked men. Right. And I think clearly I don't understand anyone to be challenging the element about taking the car by threat or intimidation. Obviously the victim had every reason to feel that he was in fear for his life, but under Holloway it's 100% clear these are two different things. There has to be a category of cases where you have satisfied the first element by showing that you put the victim in reasonable fear of his life, but still not satisfied the second element, the specific intent element, because that was an empty threat or an intimidating bluff. So my question is what is it about this case from which a jury could find beyond a reasonable doubt that this was not an empty threat given that two times the victim defies what the assailants have told him to do  Judge Harris, respectfully, the two elements that the jury has to decide is both that the car was taken by force and intimidation, the actus reus, so to speak, and then with the specific intent to do death or serious bodily harm. And I was thinking about that because with regard to the force and intimidation, obviously what Congress wanted to do was make sure this wasn't an ordinary car theft situation. And I recall an instance with a prosecutor colleague of mine who was pumping gas. A man came up to her, shoved her out of the way, got in the car and drove away, essentially stealing her car right there. And that's not a carjacking because there was no intent to do death or serious bodily harm. He used force and intimidation to push her out of the way in that two seconds and drive the car away. But he did not take a gun with two other colleagues in the middle of the night and literally with a foot from his face put that gun between his eyes where he is staring down the barrel of it. And that's what makes this case different, Your Honor. Well, I see how it's different from the case you described. But do you think it's different from the cases in the Ninth Circuit and the Sixth Circuit that have said brandishing a gun is not enough to satisfy that element? Well, Your Honor, I think the Bailey case... Can I just finish? I'm sorry. I'm pretty sure those cases are not addressing your brief. And I don't fault you for that. But it does sound like you're asking us to come into conflict with these circuits. Well, I will say we addressed Bailey. We didn't address the Randolph case, which I do think was wrongly... I guess I'm asking you if you could address Randolph and then the Sixth Circuit, the brandishing-plus case, I'm sure you know. Right. So, Your Honor, what we see here... First of all, I want to take the word brandishing out of this, right? Because brandishing is a term of art for 924C. I could brandish a gun right here and have it right in my fist, and that would be displaying the gun. This was more than brandishing. Okay. In Randolph, it was pointing the gun, too. So let's talk about pointing the gun. Okay. And in Randolph, the difference, Your Honor, is... Well, first of all, not that I do think respectfully it was wrongfully decided by the Ninth Circuit, but also they had testimony from the defendant himself, which seemed like it was persuasive to the court of appeals that he did not intend to do harm or conduct serious bodily harm or to kill this witness. And I think that they, respectfully, that the court actually credited that testimony that is absent here. But here, isn't there something even better here, which is to... Well, I don't mean to suggest anything about this was good, but from a defendant's perspective, instead of just the testimony, I didn't intend to harm him if he didn't comply, we have all these instances where they don't comply and there is no harm done. That's what seems very distinctive about this case to me. Except in Holloway, of course, the moment that matters, that forbidden intent, is supposed to come up when they get the car keys. And at this point, these assailants are trying to decide what to do in the heat of this moment, right? Mr. Rowe is telling him he's not going to give him his house keys and he's going to turn and walk away, but they got what they needed. They got what they went out there for, Your Honor. They were frustrated by the first... We do know that this isn't the kind of case where any act of defiance is going to lead to the use of force. Of course. Because there were several acts of defiance and none of them led to even, like, a repeat request for compliance. They just sort of let him walk away. And wasn't the last thing they asked him, please walk us to your car so we'll know where the car is? Well, they didn't say it like that, Your Honor. They said they wanted him to come with them. And I think when they found out he didn't have a wallet or an ATM card, perhaps, that they could go get money out of, that they didn't need him. And remember, again, we're trying to slow down what happened that night. But they told him to come with them to the car and he didn't. But they already had the car keys at that point, and that's when the carjacking already occurred when that gun was pointed. I understand. I understand. I understand, but... I do understand the point at which the carjacking occurred and that the noncompliance occurred after that. It still seems to me highly relevant on the question of intent. We can at least eliminate the set of cases that I think really concerns Judge Wilkinson where people just get mad when people don't comply and they fly off the handle and they commit unspeakable acts of violence. This isn't that case. Except that we don't know what would have happened if he hadn't given his car keys or if he had jerked his head or if he had some... Mr. Rowe had somehow moved in some way that was upsetting to these defendants, and that is why it matters how close the gun was, where it was pointed, in his face, with two other people, with the mask, after planning it, after watching him get out of the car, so they knew where the car was. There was evidence below. Judge Harris is clearly right in this sense that it's not enough just to say that the victim is intimidated. There's a whole other element, and that is the specific intent. And when you all have had this good dialogue back and forth about the facts, all I understand is that you say the facts are there in plenitude from which the jury could conclude that this was no prank, that these people were serious, they had come for a purpose. If that purpose was going to be permanently denied them, they had masks on, and they had the weapon, and they had the numbers, and they had the time of night to get what they wanted, and if he was standing in the way in any way, he was going to get badly treated. And that's not a question of, you know, whether one view of the facts or another view of the facts might strike us as persuasive. It's a question of what the jury did. It's a question of what the jury decided. This is why we have juries, so that they can bring to bear their common sense, their real-life common sense in light of the facts that are put before them. And when they're put before them, then we ask, are they put before them in the right way? Yes, because the elements of the crime were set forth, and the instructions were not objected to. But this is the whole reason we have juries, to decide whether somebody was just, you know, going to let it go and not bother, or whether it was something that was far more than some sort of empty prank. Yes, and what I would say to both, are those the choices?  Well, I thought the choices were it's either an extremely serious offense because you used force to take a car, but you didn't have the intent to kill. I didn't think prank was one of the choices. Well, I think some of the cases I'll refer to intimidating bluff, and I think maybe that's where Judge Wilkinson is getting some of that dialogue off of some of the cases where is it more than just a bluff that would happen there. Just to be clear, I don't think the defendant is arguing that this was a prank, right? Say that again. The defendant is not arguing, oh, this was just for laughs, this was a prank. No, of course not. What the defendant is arguing, what Mr. Boxler was arguing up here, Your Honor, is exactly what the very good public defender's office argued to the jury. It was a bluff, or maybe we can put it this way, were they willing to use force if he had continued to resist? And I think that the jury had ample evidence to decide that, Your Honor, and the arguments that Mr. Boxler was just making up here in court are exactly, I feel like I'm doing my closing argument. Of course not, Your Honor. It was a very vigorous issue on both after the trial but also during the jury selection. So we have to view it in the light most favorable to you, to your client. To justice. The government. Yes, Your Honor, and what happened that night and the jury's consideration of all the evidence. This was a hard-fought case. The evidence came in over a course of days. The public defenders vigorously represented Mr. Small. They made exactly these arguments to the court. In fact, I feel like I'm giving my closing argument, right, because it is exactly what the jury heard, the pros and cons. Yeah, but they didn't do anything when he didn't give them his house keys. Yeah, but they pointed a gun in his face, and we made those arguments. I just want to go back to the precedent from the other circuits on this. So for Randolph, you would say we should just disagree with the Ninth Circuit. I think that there are facts in the case that allow you to distinguish it, but I do think it was wrongfully decided as well, Your Honor. It sounds heart-attacking to me. But from the Sixth Circuit, that brandishing a weapon without proof that it's loaded is not enough. And, Your Honor, here, when they have, again, I believe in that case, but they actually had the evidence that it wasn't loaded, but I don't think that's the determining factor here because for the reasons you spoke. So we would just disagree with the Sixth Circuit too, which is fine. We're not bound by anything. Of course not, but I think that the facts of this case are particularly unique, and the jury in this case heard all of the facts, and it's so hard to sit here now and parse about everything that was relevant to the jury. I really am just trying to figure out how this opinion would write, and so I think maybe your answer, and it's a totally legit answer, is yes, you should disagree with the Ninth Circuit and the Sixth Circuit, both of which upheld pointing a gun without evidence. Well, the Ninth Circuit says even if it's loaded, that's not enough to show specific intent. The Sixth Circuit says it needs to be something more than pointing a gun if you don't know that the gun is loaded. And I think we have the something more here. And what is the something more? I think the three masked men at night, the frustration of the robbers from the prior robbery, the fact that they were going there to hit the gun. Well, the facts in Fiquette were pretty scary too. Yeah, they're all scary, Your Honor. I don't think Fiquette suggested that that would be sufficient. It was that they said you need circumstantial evidence that it's loaded, a verbal threat that you're going to kill the person, where pointing the gun by itself, even though it's sort of the equivalent of a threat, is not enough, they said. I mean, I just, do you want us to try to distinguish that case, or do you want us to just say it's wrong? I do believe both of them were wrongfully decided, Your Honor, I do. That's very helpful. At the end of the day, you know, it's a fact-finding mission by the jury, and the jury here found sufficient facts to do it. So we should just disagree with them. Which makes good common sense, in fact, that the jury decided this. Well, in a sense, we're saying they're wrong, but in another sense, we're saying the jury could have decided the way the Sixth Circuit and the Ninth Circuit decided. They could have. You know, so, in other words, there's nothing that precludes a jury. There was nothing in our ruling that would preclude a jury from making the exact decision that the appellate judges thought they were empowered to make from an appellate perch. I mean, whether the Ninth Circuit and the Sixth Circuit are right or wrong would depend upon the facts. Not upon a matter of law, but upon the facts as it was presented to men and women of good common sense. I don't disagree with Your Honor. Is there any other issues the court would like me to address? Well, you've got the search question. Pardon me, Your Honor. What about the search? Your Honor, I— What about the telephone? As I— Cell phone. As I argue in my brief and as I argue below, I think there are a myriad of exceptions to the warrant requirement here. Well, but the judge, you only have to hear they decided the abandonment issue, and you raise the other alternative issues. How do you want us to deal with it? But I think you can alternatively look at the other issues, but obviously it's the abandonment issue that's here, Your Honor. And I—you know, one of the issues that kind of got overlooked in all of this when Mr. Boxler was up here arguing for Mr. Small is that when Mr. Small took off his shirt, because obviously he had to take off his shirt and hat when he ditched, and when you get rid of a phone, the first thing that common sense relies upon here is that that phone is the immediate thing that can make law enforcement find you, right? Because it is that phone that lets them ping it or look for you when you have it. Now, it's not what happened here, but when you're in the heat of the moment and we're talking about that abandonment of that phone, the abandonment of the car, the running from the car, the throwing the clothes off, the phone being found 50 yards from all of that, we're talking about— How close was the phone to the—I really am unclear on the geography. How close was the phone to this dorm and the path when it was found? So, Your Honor, maybe I should have put a map in to let the court know, and I think we did it by distances as well. It almost sounded to me like there was a map at the suppression hearing. Oh, yeah, there was a map at the suppression hearing, obviously. I didn't see it on the—anyway, thank you for your time. And I'm sorry about that because usually I do like to include those things, but I was thinking here the description was enough, so it was within about 50 yards. With regard to the area where I have to think about, I'm not good about measuring distance, but there was a wooded kind of open area. I hate to use the word mirror where the dorms were, but— But it was close to some dorms where a lot of people live. It was—I would say close, Your Honor, because even where the defendant was found in the sewer, it was close. Right, right, right. So when they first found the phone, there was nothing—there was no particular reason to believe it belonged to the person who had crashed through the gate rather than someone who lived in this dorm, right? Well, I don't know about that, Your Honor, because remember, they're doing a periphery search at this moment, and it's what's going on in law enforcement's head at this moment, so they see this wrecked car. I mean, it would be a huge coincidence indeed— How many people lived in the dorm? I mean, people dropped phones— I really don't even know, Your Honor, but there's people that clearly live there. Right, so there's no way of knowing that the phone— It wouldn't be a weird coincidence. It could be that that shirt belonged to somebody in the dorm, too. Well, the shirt's all bloody. Like, that's a less common thing to drop by the state. No, I think a phone is also something common for people to get rid of when they're on the run because it helps us find them. That wasn't my point. My point was people drop phones sometimes. They rarely drop bloody shirts when they're just out walking outside their dorm. They drop hats. But not bloody shirts. They drop hats. Okay. There was a hat here. There was a hat here. The hat was next to the bloody shirt. The hat was— And neither was next to the phone. And the hat may have had some blood on it, too. It depends on how you interpret the language of the record. It says a bloody shirt and hat. But I don't know whether the blood and violence has a hat or not. But then the phone was a little farther away. A little farther away. From the car wreck. A little farther away, yes, sir. But certainly within the area. And the bloody shirt and hat were found first. That's correct. And then the phone was found. That's correct. The Supreme Court is looking at privacy interests and whether police have evaded privacy interests in a way that we ought to deter. And one of the things is that they have said that there's no privacy interest even when you put trash in front of your home. It doesn't implicate that there's a relinquishment of the privacy interest here in light of those cases and others. They can see this as being abandoned because it was in the strategic interests, I suppose, of the defendant in that panic moment. Not to be apprehended with the cell phone on his purse. And, you know, maybe he got rid of it because he could claim that it was someone else's. Or maybe he got rid of it because he didn't think they would find it. Maybe they got rid of it because he didn't want it on his purse and didn't link that closely to it when he was apprehended. But it was a long, long time. He made no effort to recover it, as far as I know. But, you know, the ultimate question here is, did the officers really do anything that impaired someone's reasonable expectation of privacy? And did they do it in a way that we absolutely, that we need to defer? Because I don't think that LELON applies purely to the submission of an affidavit into a bare bone warrant. I think it applies broadly to the objective good faith of officers in the course of police work. I just don't think LELON has been limited simply to the warrant situation. And I do think, Your Honor, and I hope this answers some of the concerns of you as well, Judge Harris, that the unique circumstances of this case are that when they found the phone and clue, yes, it could possibly be the defendant's, possibly not, take it back, plug it in maybe to make that inquiry, see if it is even working, see if it's old. And within 20 minutes, it's ringing. They don't do a search, per se, of the phone. And this goes more to the exclusionary rule issue that Judge Wilkinson is saying. They are not immediately opening the phone and going through the text. They are still in an exigent circumstance. And I appreciate that I'm blending the two at this point. But that's the uniqueness of the situation. There's actually, there's a, let me, I don't mean to cut you off, but I actually wanted to ask you a question about this. There are a bunch of cases saying that if the police find a phone, whether or not it's been abandoned, they can do like a very preliminary search just to try to identify the owner of the lost phone. But did you argue that? I mean, it doesn't, that's different from abandonment and it's different from exigent circumstances. Yes, I know that. And that's why I put the picture of the phone to show what they did. And the cases that I cited below were exactly that point just for the preliminary identification of the phone. Yeah, so that would get you the first, that would certainly get you the first, if. Through the first hurdle. It would get you the first search. But what about the next three? Well, and we call them searches. I mean, the answering of the phone or the calling, the pushing of. Yeah, the first time. Once you've, it allows you to make, perhaps, at least some courts have held you can do this very preliminary inquiry just to identify the owner. I don't think it allows you to do continued searches once you know who the owner is. And they, and they didn't do continued searches, Your Honor. This was all about now at this point striking the high, you're trying to find this individual now that they've identified him and only speaking to the person that's called, that was calling on those messages. I don't think that those cases don't allow you to do things like once you've identified the owner, look at the serial number or answer a few more phone calls. I think that they're pretty limited to, it's reasonable to try to figure out who owns the phone, but then you have to stop. And then we have to go to what, I mean, the officers did get a warrant that day. But only after there were three more searches of the phone, right? Searches meaning in terms of talking to the wife to see if they could figure out where the defendant is. Can't we consider the evidence that came in during the trial relating to the surrounding circumstances? Yes, I think the law is very clear that you can do that. I think you can. Oh, yeah, absolutely. Yes, of course. I think your colleague there, I thought he was arguing that you couldn't. But if the officers knew of that, you can't consider stuff that the officers didn't know at the time they searched the phone, right? Well, you have to, you mean in terms of their good faith? No, in terms of whether or not the search was permissible. You always look at what the officers knew at the time. Like stuff that you find that the officers found out only after they searched the phone. I think the evidence is clear without even considering what happened at the trial about the abandonment. But the evidence at the trial about what the officers knew at the time would come in, I think. But not, I mean, I can't think of any for them. If the police come in and search my house without a warrant, they're not allowed to say, good thing we found something. I guess our search was okay. Well, that's boilerplate law that we don't do that. That's why I'm asking you why it would be different here. It is boilerplate law. You have to judge the permissibility of a search based on what the officers knew at the time they conducted the search. And it doesn't have to be proof beyond a reasonable doubt. It has to be whether a reasonable author would think that this phone was abandoned enough to be able to answer it. At the time. And the consent issue, which is not laughable here. I mean, we all laugh because he didn't stop to read the sign. Ms. Wilkinson, one of the things that Judge King brought up is, again, the standard of review means a great deal. And we have said abandonment is a question of time. And there was trial before the expression here, before the trial judge. And he heard the testimony. He heard the testimony of the officers and the like and made a conclusion. And so I think, you know, a part of this case, at least, is the degree to which we want to credit fact finding. And the degree to which we can recognize that officers who testify and others, you know, both sides of the question, who can testify at a suppression hearing, and lawyers and witnesses and many others who appear before a jury, that they have a vantage point that, you know, we can respect. We, as appellate judges, have some natural tendency, I understand it, to draw things away from the trial level and make them into matters of law and transform matters of fact into somehow matters of law. But there's something to be said, at least, for crediting the people who make the decisions at the ground level with actually tactile contact with the actual human dimensions of the people involved. Up here, it tends to get a little more abstract. But, you know, we each have our jobs to do. But these are factual matters. Not everything is a factual matter by a long shot. Of course. There's a big factual component here. Well, I see that my time is up, but I did want to correct one thing, Judge Wilkinson. Here, the trial judge and the suppression judge were two different ones. Judge Blake actually did, and then was transferred to Judge Bernard, as Judge King had pointed out. And a lot of the facts have been stipulated, too, on the abandonment issue. But it wasn't revisited. It was not revisited. It was not revisited. By the defense. On page 26 of your brief, you got in there with authorities, court-serving authorities, uniformly, where the federal courts uniformly held that an elephant's tribunal may consider evidence adduced at trial that supports the district judge's ruling. All right.  Judge Harris, do you have some further questions? Thank you, Your Honor. Thank you. We have Mr. Boxler. Thank you, Judge Wilkinson. I do want to pick up on the last point, Judge King, where you left off in terms of the question of fact versus question of law in this abandonment piece. In the Stevenson case, 396F3, 538, does wrestle with this question and says that the question of intent, what was the intent, that's the question of fact. But the question of abandonment is the question of law that gets reviewed de novo. And here, of course, it was stipulated. There was no weighing of the evidence. There was no witnesses who came in that there needed to be a deference to. There was a stipulated set of facts. You all just stood up and told the judge what the facts were. That's right, Judge King. Kind of a strange way to do it. I'm surprised it didn't have some evidence. And I think the reason— But she said they're not disputed. That's right. And nobody disputed the facts that she recited. That's correct, Judge King. And you're not contending on appeal that there's any clear error with respect to the facts. Correct, Judge King. That the judge considered. Correct. And I think because of that, based on the facts, again, to go back to the government's concession, that there's no way one way or the other to tip you into the intent to abandon versus accidentally lost, and that tie needs to be resolved in favor of Mr. Small. There was a question about the dorm and how many people lived there. I think, Judge Harris, that was you. The testimony was that there was hundreds, and that's J, A, 30, 33, and 35. There was also a question about the timing of the shirt and the hat. Those were found close in time to when the crash was, and the phone was found eight hours later, which I does think is—and there's no blood on it. For example, Judge King, you're asking some questions about that. There's no blood found on the phone versus there was with the shirt and hat, which were found. There was blood found on the hat? Yes, Judge King. And the shirt. I thought the briefs anyway were vague on that point, but there's blood on the shirt. Correct. And then there is— But no blood on the phone. Well, might not—maybe. Was it raining that night? It was. It was raining. There was testimony that it was raining. There was another question. I think, Judge Wilkerson, you asked whether there could have been— How far was the phone from the hat and shirt? Fifty yards. Fifty yards. Fifty yards further away from the crash, I think, was the testimony. Coming away from the crash, they found the shirt and hat. And 50 yards further, they found the phone. Correct. And how far was the phone from the path outside the dorm? The testimony was alongside the path on that? It was both found in the—going from the car to the sewer pipe where he hid himself for 13 hours. The hat and the shirt on the one hand and the phone on the other were between the two. Correct. Correct. And there's the officer who found— So he was running from the car, hurt, and he lost his shirt and hat, put one on, and then lost his phone or whatever. They were left there between the two sites. And he hid in the ditch or the sewer pipe for 13 hours, and they found him. Right. And, of course, the officers who searched the phone or found the phone didn't know where— It was all on the National Security Agency property, which is within the confines of Fort Meade. Right. And it's one of the most highly secured areas in the world. Correct. And just one point on that is that the government doesn't dispute that they had time to get a warrant after they found the phone. And I think that resolves some of these exigency questions that Judge King and Judge Wilkinson, you're struggling with. And if there is time to get that, the Supreme Court's exigency cases are clear that you need to apply for and get a warrant. And here you could have done it with a phone call, and instead they waited for 30 minutes after finding it. So I think that resolves the exigency. But we just deal with the facts that come up here. We can't change the facts. Really? And they're warrantless. If it's a search, it's a warrantless search. Right. Right. But they found the phone, and they found the shirt and all that stuff. Right. They finally found the fellow. Right. And, of course— And they identified him as a result of finding the phone and pushing the return call button, and his wife answered. That's right, Judge King. That's right, Judge King. I do want to just pick up on the sufficiency issue. Now, I direct the court to read footnote four in Bailey, where this court made clear that no matter— that the trial court judge in that case, in sustaining the conviction, really emphasized how scary it was. And it was at night, and the victim had every reason to be fearful for his life. And the court said that's the wrong focus of the analysis. The question isn't— I mean, there are two parts of it. One is the intimidation part, and the other is the specific intent. That's right. So it's not irrelevant what they were discussing. I mean, I don't think—I totally agree that the specific intent does not turn on the trauma that the victim feels or the subjective feelings of the victim. I mean, it must have been terrible to go through what Mr. Rowe went through. But that's not dispositive of the legal question. The legal question of specific intent, I think your opposing counsel brought up. The only question here is could a jury apply its ordinary, everyday experience to find that there'd been resistance because the whole thing is conditional, that these people would have followed through with some very unfavorable, violent consequences to Mr. Rowe. Right. And if I do—I see my time is up, but I do want to address the Randolph and Fiquette, if I may, Judge Harris. Please. In those cases, you're right, in both of those, there was— The ninth and sixth circuits, though. That's right, Judge King. Randolph was the ninth and Fiquette was the sixth. And in both of those, there is testimony that the gun was loaded. We don't have that here. But also, in those cases, there wasn't the repeated defiance by the victim, which we have here, despite the commands that the robbers gave to the victim. Isn't there a presumption of loaded gun? What's going on at you? Not that we're aware of, and the government certainly hasn't. I'd probably make one if I had a chance. I would direct Your Honor on that point to footnote 13 of the Supreme Court's Holloway decision, which favorably cited, I believe, a case from Mississippi where the Mississippi court said you can't make that jump. That may be right, but I'm just saying if somebody points one at me, I assume it's loaded. I'll presume it's loaded. I'm going to do what they say. I can testify the gun was real, and you can, you know, you can whiplash somebody with a gun and talk about serious bodily injury. If I'm smacked up to the side of the face with a gun, it's likely to cause me serious bodily injury. And the point is the jury could take into account that. Two things, Judge Wilkinson. Doherty and Caswell were victims. They weren't co-conspirators. There's no testimony here from any alleged co-conspirator or any defendant about the gun was real. We were prepared to shoot it. There's nothing like that, and it was Doherty who said that he was in the military, and he believed it was real at the time. I thought the district court found at sentencing that there wasn't an enhancement because there was actually no evidence that it was a real gun. I could be mixing up my pieces. Tell me if I am. That's right, and the government agreed on that point as well that even a good, I think the statement from the judge was even a good DEA agent or a good police officer might not be able to tell in the dark of night whether it's real or loaded. It could have been a pellet gun or something like that. So that certainly informs it as well, and for those reasons, Your Honor, we have to relieve from our papers. Thank you, Your Honor. Did you all get in this on the CJA Act, your law firm handling this? Not under CJA, no, Judge King. You're just doing it. Well, we were asked for assistance by the Public Defender's Office. That's very commendable what you have done. Thank you, Your Honor. You've done a terrific job. Thank you for your time. Thank you. We will adjourn court and come down and read the court. This honorable court stands adjourned, signing off, with God save the United States and this honorable court.
judges: J. Harvie Wilkinson III, Robert B. King, Pamela A. Harris